IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| TERIE WILLIAMS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION NO. 1:09CV1084-SRW |
| | ) (WO) |
| MICHAEL J. ASTRUE, Commissioner | ) |
| of Social Security, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OF OPINION**

Plaintiff Terie Williams brings this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) seeking judicial review of a decision by the Commissioner of Social Security ("Commissioner") denying her applications for a period of disability and disability insurance benefits and for supplemental security income under the Social Security Act. The parties have consented to entry of final judgment by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c). Upon review of the record and briefs submitted by the parties, the court concludes that the decision of the Commissioner is due to be affirmed.

**BACKGROUND**

Plaintiff was born on May 24, 1972, and obtained a GED in 1999. She has past relevant work as a cook, cashier, and dishwasher at fast food restaurants; as a machine operator shrink-wrapping movies at the Movie Gallery warehouse; as a sewing machine operator at a sewing factory; and as a condom-testing machine operator for Personnel Resource and Alatech. (R. 29-30, 104, 106, 113-120, 140). In July 2006, when she was thirty-four years old, plaintiff

filed applications for disability insurance benefits and supplemental security income (R. 83-94), alleging that she became disabled on January 31, 2005, due to depression and chronic lumbar back pain (R. 100).

On May 15, 2008, after plaintiff's claims were denied at the initial administrative level (R. 58-61, 65-69), an ALJ conducted an administrative hearing during which he heard testimony from the plaintiff and from a vocational expert. (R. 24-47). At the hearing, plaintiff testified as follows:

She cannot work because she has a lot of back pain, her left side goes numb and sometimes she is unable to hold anything with that side. She has full custody of her four children, ranging in age from eight to sixteen. Two of her children receive disability, and she is able to take care of the money for them. She goes to group therapy at SpectraCare six times each month for treatment of her emotional problems, and they prescribe medications; sometimes she drives but, most of the time, her niece takes her. She uses a food stamp card to pay for groceries, and is familiar with and abides by the rules regarding its use. She is able to follow her physician's instructions regarding her medications. She takes naproxen daily for back pain and, when she is in a lot of pain, she takes Lortab. The medications help with her pain. Her pain is worse if she does any heavy lifting, too much bending or if she stands too long.

She spends her days sitting at home because she has anxiety attacks; she gets hot, feels as though she is going to pass out, and wants to "go hide or something" if she is around too many people. On two or three occasions, she has been unable to leave her room and a lot of

times she is scared to leave her house and her adult niece has to walk her out to her car. Because her therapy group is small, with only about three participants, she does not experience this problem with going to group therapy. She could not return to her job as a dishwasher or at Movie Gallery because of the standing, and she could not work as a cashier because of "too many people[]." Her treatment provider at SpectraCare has recommended inpatient treatment, but plaintiff takes care of her children and does not want to be away from them. Plaintiff's niece and her brother help her with "things around the house" and with paying bills. She has had physical therapy for her back and wears a TENS unit three times a week, but she is still having problems with her back. (R. 29-41).

The ALJ rendered a decision on July 18, 2008. He concluded that plaintiff met the insured status requirements of the Social Security Act through December 31, 2009. He found that she has "severe" impairments of: "[a]sthma; major depressive disorder; lumbar strain; and post-traumatic stress disorder (PTSD), with psychosis[.]" (R. 13). He found that plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of any of the impairments in the "listings" and, further, that plaintiff retained the residual functional capacity to perform "work at the light exertional level with a restriction on climbing ladders, ropes, or scaffolds; no exposure to dangerous heights or machinery; and is limited to unskilled work with only occasional interaction with the general public and co-workers." (R. 16, 19). He concluded that she is unable to perform her past relevant work but that there are a significant number of such jobs in the national economy – including cleaner, laundry worker and cafeteria worker – which the plaintiff can perform. (R. 21-22). The ALJ

concluded that plaintiff is not disabled within the meaning of the Social Security Act. (R. 23). On October 27, 2009, the Appeals Council denied plaintiff's request for review (R. 1-5) and, accordingly, the decision of the ALJ stands as the final decision of the Commissioner.

## STANDARD OF REVIEW

The court's review of the Commissioner's decision is narrowly circumscribed. The court does not reweigh the evidence or substitute its judgment for that of the Commissioner. Rather, the court examines the administrative decision and scrutinizes the record as a whole to determine whether substantial evidence supports the ALJ's factual findings. Davis v. Shalala, 985 F.2d 528, 531 (11th Cir. 1993); Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991). Substantial evidence consists of such "relevant evidence as a reasonable person would accept as adequate to support a conclusion." Cornelius, 936 F.2d at 1145. Factual findings that are supported by substantial evidence must be upheld by the court. The ALJ's legal conclusions, however, are reviewed *de novo* because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied. Davis, 985 F.2d at 531. If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, the ALJ's decision must be reversed. Cornelius, 936 F.2d at 1145-46.

## DISCUSSION

### Treating Physicians' Opinions

Plaintiff argues that the ALJ erred by failing to give any weight to the opinions of two of her treating psychiatrists at SpectraCare, Dr. Fay Ferrell and Dr. Fernando Lopez. On January 23, 2007, Dr. Ferrell completed a form on which she circled ratings of "mild,"

"moderate," "marked," or "extreme" to indicate plaintiff's estimated degree of impairment or restriction in eighteen listed work-related mental functions. Although the form indicates that the responses are to be provided "[i]n addition to the information provided in your narrative report," (R. 221), Dr. Ferrell did not attach a narrative report to the form, nor did she complete the final section of the form, which includes several blank lines for "Comments[.]" (See Exhibit 7F, R. 221-23). Dr. Ferrell indicated that plaintiff's estimated degree of impairment is "extreme" with regard to two of the listed areas, "marked" as to seven of the identified functions, "moderate" as to seven more, and "mild" as to two. (Id.). Dr. Farrell indicated that plaintiff's limitations met the twelve-month duration requirement. (Id.).

Fifteen months later, on May 1, 2008, Dr. Lopez and plaintiff's therapist, Tammy McCarter, signed a letter directed to the Houston County Food Stamp office. The letter stated that plaintiff was diagnosed with "Major Depressive Disorder, recurrent, severe with psychotic features" and "Post Traumatic Stress Disorder" and that "[b]ased on individual's current depressive/psychiatric state, I believe she is mentally unable to work at the present time." The letter stated that the "[d]ate of onset was 12 July 2006" and that the "[c]ase can be re-evaluated in 6 months to chart the progress of the consumer for possible employment." (R. 327).[1]

"If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it

---

[1] In her brief, plaintiff argues that the ALJ failed to give weight to Dr. Lopez' letter of August 7, 2008. (Plaintiff's brief, pp. 9-10)(citing R. 148). However, this letter was not before the ALJ. The ALJ issued his opinion on July 18, 2008. (R. 8-23).

controlling weight." Roth v. Astrue, 249 Fed. Appx. 167, 168 (11th Cir. 2007)(unpublished opinion)(citing 20 C.F.R. § 404.1527(d)(2)). "If the treating physician's opinion is not entitled to controlling weight, . . . 'the testimony of a treating physician must be given substantial or considerable weight unless "good cause" is shown to the contrary.'" Id. (citing Crawford v. Commissioner, 363 F.3d 1155, 1159 (11th Cir. 2004)). "If the ALJ finds such good cause and disregards or accords less weight to the opinion of a treating physician, he must clearly articulate his reasoning, and the failure to do so is reversible error." Pritchett v. Commissioner, Social Security Admin, 315 Fed. Appx. 806 (11th Cir. 2009)(unpublished opinion)(citing MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986)). "When the ALJ articulates specific reasons for not giving the treating physician's opinion controlling weight, and those reasons are supported by substantial evidence, there is no reversible error. Schuhardt v. Astrue, 303 Fed. Appx. 757, 759 (11th Cir. 2008)(unpublished opinion)(citing Moore v. Barnhart, 405 F.3d 1208, 1212 (11th Cir. 2005)).

The ALJ acknowledged that Dr. Ferrell's medical assessment indicated mental impairments of listing-level severity because Dr. Ferrell noted that plaintiff has a marked limitation in her ability to maintain concentration, persistence, or pace and an extreme limitation in activities of daily living. (R. 16). The ALJ declined to give Dr. Ferrell's opinion any weight because it was inconsistent with plaintiff's own progress notes, with the records of Dr. Handal (another of plaintiff's psychiatrists), and with the plaintiff's activities of daily living. (Id.). The ALJ pointed specifically to Dr. Ferrell's observation in her treatment notes that plaintiff's report of her symptoms was vague and that she was applying for disability. (Id.).

Dr. Ferrell first evaluated plaintiff on September 7, 2006 (see R. 275, annotating reason for visit as "New"), about two months after plaintiff first sought treatment from SpectraCare (see R. 294-305, Intake assessment and treatment plan by therapist on 7/12/06, co-signed by Dr. Hammack on 7/15/06). Dr. Ferrell observed, in this initial evaluation, that plaintiff was tearful and passive, and had a constricted affect and depressed mood, but no psychosis or abnormal movements, and that she was clean and casually dressed. She recorded plaintiff's report that she was in fear "[secondary to] exBF breaking into home, beating daughter" but that she had a protective order. Dr. Ferrell prescribed medications. (R. 275). Although Dr. Ferrell scheduled plaintiff for a follow-up appointment in three months, on December 7, 2006 (id.), there is no treatment note indicating that Dr. Ferrell saw plaintiff in December or at any other time before she completed the questionnaire on January 23, 2007.

However, SpectraCare's records indicate that plaintiff attended ten group sessions and one individual session with counselors at SpectraCare between the time of her intake on July 12, 2006 and the time Dr. Ferrell completed the questionnaire on January 23, 2007. (See Exhibit 9F).[2] At intake, plaintiff reported regular attendance at church (R. 300). The therapist noted plaintiff's flat affect and depressed mood, and her denial of suicidal/homicidal ideations or psychosis, at the first two sessions in July and August (R. 293, 306). In mid-August, plaintiff had an "appropriate affect/depressed mood" and stated that she had been "attacked by her ex

---

[2] Plaintiff attended a group counseling session which met, usually, on alternating Thursdays. Plaintiff's attendance was regular through the time of Dr. Ferrell's questionnaire, except that she did not attend the group meetings during the six-week period between October 5, 2006 and November 16, 2006, and the record includes no note indicating plaintiff's attendance at the session scheduled for December 17th. (R. 287-89).

7

boyfriend who entered her home uninvited." (R. 292). On September 7, 2006, the day on which plaintiff first saw Dr. Ferrell, plaintiff's counselor noted an "appropriate affect/depressed mood" in group therapy; plaintiff reported that "she found herself running around the house with a knife in hopes that she would fall and hurt herself." (R. 291).

However, two weeks later, on September 21, 2006, plaintiff had a "bright affect/subdued mood." She reported "feeling better since last session," and stated that "continuing to help others keeps her mind off her own problems." She "[s]hared a pamphlet about the soup kitchen she volunteers for." (R. 290). On October 5, 2006, she presented with a "bright affect/neutral mood and casual appropriate attire." She "reported being med compliant with quality sleep/healthy appetite," and she "denied S/H ideations and psychosis." She reported that her skin burns and hurts even to wear clothes, but that "physicians cannot find any reason for this." (R. 289).[3] Plaintiff next appeared for the group meeting on November 16, 2006 with an "appropriate affect/depressed mood" and reported that she was "not getting out of the house much" and "not looking forward to the holiday session." (R. 288). Plaintiff returned next for a group session on December 21, 2006. She came in on crutches, reporting that she "sprained her ankle and knee by stepping in a hole while cleaning up the yard at church." She presented with an "appropriate affect/depressed mood" and "appear[ed] very depressed." She reported

---

[3] Plaintiff also made this allegation in her consultative examination (see R. 193, plaintiff complaining that her skin is "hypersensitive to touch"), but she provided no medical records of treatment for this condition. The record of treatment for physical complaints is sparse – it includes Dr. Flanagan's brief period of pain management treatment (Exhibit 1F, July 28, 2005 to October 7, 2005), plaintiff's outpatient treatment at the emergency room after she was involved in a motor vehicle accident in February 2007 (Exhibit 8F), plaintiff's referral to PT unit for evaluation, treatment and a TENS unit by Dr. Catherine James Peters four days after the accident (R. 228), and two PT visits, including the initial evaluation, on February 28, 2007 and March 2, 2007 (R. 229-34).

8

that "the church she volunteers for is becoming too demanding[.]"  (R. 287).

At an individual session with her therapist the following week, on December 29, 2006, plaintiff stated that she "took a few days from volunteering at the church," and that "they stated it would be a problem to find someone to fill in, and that they depended on her."  The therapist wrote that "[m]uch of consumer's stress comes from feeling obligated to work long hours at the church and taking people's verbal abuse."  (R. 286).[4]  In her notes for plaintiff's next group session on January 4, 2007, the therapist wrote, "Client presented with appropriate appearance, with effectively managed personal hygiene.  Dressed appropriately.  Oriented X4.  Denies suicidal or homicidal ideation, intent, or plan.  Affect was consistent with mood.  Reports being compliant with medications with no ill effects.  Client was late for group and sat mostly quiet but responded when requested."  The therapist noted a "[d]ecrease in depressive symptoms."  (R. 285).  At her next group therapy session on January 18, 2007 – five days before Dr. Ferrell completed the questionnaire – plaintiff "reported doing 'ok'."  (R. 284).  She had an "appropriate affect/level mood" and reported medication compliance and "quality sleep/healthy appetite."  (Id.).  She "[p]articipated in discussion well, and gave needed support to other members" and "shared her knowledge of community resources with other members."  (Id.).  The therapist indicated that plaintiff was making moderate progress toward her goals.  (Id.).

In the two months following Dr. Ferrell's assessment, plaintiff attended four group

---

[4] During this session, plaintiff "[r]eported that she was in the hospital for two weeks after a neighbor called an ambulance after consumer did not wake up for three days.  Reported she lied [sic] in bed sweating and was swollen up.  Drs said she had an infection and an enlarged kidney." (R. 286). Plaintiff did not provide the ALJ with any medical records regarding this reported two-week hospitalization.

meetings, with the therapist continuing to note moderate progress toward her goals. (R. 280-83).[5] On April 4, 2007, a therapist wrote, "Met with group briefly in the absence of the assigned therapist. 3 of 7 attended this date. No indications of any mood difficulties overall. No Si/Hi verbalization. All needed medications and are scheduled to see the doctor today." The therapist wrote that plaintiff was quiet but attentive to and supportive of another peer's distress. (R. 280). When plaintiff met with Dr. Ferrell later that day – the second time plaintiff was evaluated by Dr. Ferrell – Dr. Ferrell noted plaintiff's statement that she was "[t]ired" but "guess meds are working ok." She was clean and casually dressed, had a blunted affect and level mood, no abnormal movements, and limited insight. Dr. Ferrell wrote that she was "passive" and "avoided eye contact." She wrote, "Pt vague in her [symptoms] description – has applied for disability – *unlikely will report benefits from meds*[.]" (R. 274)(emphasis added). Two weeks later, plaintiff's group therapist wrote, "Consumer presented with appropriate affect/level mood and ca[su]al appropriate attire. Consumer reported being med compliant with fair sleep/healthy appetite. Denied S/H ideations and psychosis. Consumer appears to be doing better than previously, not crying as much during group and even smiling. Consumer reported feeling very blessed today. Appears to be in a positive mood and using positive thoughts to help her through the day." (R. 279).

Thus, the evidence of record demonstrates that, a little over two months after she completed the questionnaire, Dr. Ferrell noted plaintiff's application for disability benefits and

---

[5] There is no indication in the record that plaintiff attended the group session scheduled for February 1, 2007. (R. 283-84).

indicated the likelihood that plaintiff would not report benefit from her medications;[6] the SpectraCare notes for plaintiff's group sessions for the period from January through April 2007 reflect that plaintiff was compliant with medications and making moderate progress toward her goals. The ALJ's statement that Dr. Ferrell's opinion is inconsistent with her treatment notes is supported by substantial evidence of record.

The ALJ further noted that Dr. Ferrell's assessment is inconsistent with Dr. Handal's treatment notes assessing a GAF score of 60 (See Exhibit 2F, R. 184, 186, 188) and the score of 55 assessed on intake at SpectraCare. (R. 294). A Global Assessment of Functioning score of 51-60 is indicative of moderate symptoms or moderate difficulties in social, occupational or school functioning (see American Psychiatric Association, *DSM-IV-TR* (4th ed. 2000) at p. 34) and is, as noted by the ALJ, generally inconsistent with Dr. Ferrell's assessment of marked and extreme limitations in nine of the eighteen rated functional areas, particularly in light of the improvement in symptoms noted in group therapy.[7] The ALJ also concluded that Dr. Ferrell's questionnaire is inconsistent with plaintiff's activities of daily living, including plaintiff's ability to manage the child support and disability payments for her children. (R. 16; see plaintiff's testimony at 31-32). The medical record reflects that, in addition to managing money, plaintiff volunteers at a soup kitchen and attends worship regularly (Exhibit 9F; see also R. 123, attends church "every Sunday"), that she was attending her group therapy sessions

---

[6] Plaintiff's application for benefits was filed in July 2006, within two weeks after plaintiff's initial intake evaluation at SpectraCare. (Exhibits 1D, 2D, 9F).

[7] The ALJ's observation that Dr. Handal "noted in May 2006, that the claimant's depression was in complete remission" (R. 16) is incorrect. The diagnosis of depression "in complete remission" was made by Dr. Pichler, another provider in Dr. Handal's practice, on January 16, 2006. (R. 187).

fairly regularly at the time Dr. Ferrell signed the form (Exhibit 9F), and that she talks to friends or relatives on the phone daily, helps her children with their homework, does laundry, feeds her dog, watches television for thirty minutes at a time (and is able to remember what she sees), and reads her Bible daily (and is able to remember what she has read). (Exhibit 6E). Plaintiff's reported daily activities are inconsistent with Dr. Farrell's ratings, including her assessment of plaintiff's restriction in activities of daily living – "e.g., ability to attend meetings (church, school, lodge, etc.), work around the house, socialize with friends and neighbors, etc." – as "extreme" and her "marked" ratings of plaintiff's limitations in attention and concentration and ability to understand, remember and carry out repetitive tasks. This reason stated by the ALJ is also supported by substantial evidence, and the ALJ did not, accordingly, err in his analysis of Dr. Ferrell's opinion.

The ALJ also declined to give any weight to the May 1, 2008, opinion of Dr. Lopez that plaintiff was "mentally unable to work."[8] The ALJ observed that the group therapy record from May 2008[9] shows that plaintiff was non-compliant with her medications. On May 1, 2008, plaintiff reported illegally obtaining a gun to use on someone who had stolen her son's bicycle

---

[8] As the Commissioner argues, it is not apparent from the record that Dr. Lopez ever actually evaluated the plaintiff, as there are no treatment notes from Dr. Lopez in the administrative record. Plaintiff has not demonstrated that his opinion is entitled to the deference generally accorded to the opinions of treating physicians. Even if he is a "treating physician," however, Dr. Lopez' opinion that plaintiff is "mentally unable to work" is not – under the Commissioner's regulations – a "medical opinion" at all. Instead, it is an opinion on an issue reserved for the Commissioner and, accordingly, is not entitled to "any special significance." 20 C.F.R. §§ 4045.1527(e), (e)(1), (e)(3).

[9] The ALJ states that the note was for a May 15, 2008, visit; it bears the date of May 15, 2008 at the top of the page, but that is the date of the next scheduled appointment. The note is for May 1, 2008, the same day that Dr. Lopez signed the letter to the food stamp office. (R. 314).

and, also, a panic attack at Walmart when she had to go there during the day. However, as the ALJ observed, plaintiff also reported that she was not compliant with her medications. (R. 314). The ALJ noted, additionally, that Dr. Lopez' opinion was inconsistent with the SpectraCare record and the record as a whole. The SpectraCare record through April 2007 is described above; after April 19, 2007, plaintiff began attending group sessions irregularly, attending on May 17, 2007, and then not again until July 5, 2007. (R. 277-79). She did not report for group therapy again until August 16, 2007. (R. 276-77). Plaintiff was scheduled to see a doctor on June 28, 2007 (R. 274), but did not do so until July 26, 2007, when she saw Dr. McManus. She told him that she was not taking her medications and had been out of them for a month. Dr. McManus scheduled plaintiff for an August 23, 2007, appointment but there is no record indicating that plaintiff was evaluated on that date. She appeared for an evaluation by Dr. McManus on September 6, 2007, again reporting that she had not taken her medications for the past month. (R. 272-73).

On December 6, 2007, the therapist who conducted the group session indicated that plaintiff was not compliant with medications; plaintiff stated that she did not want to be on medications and had spoken with her physician and informed the doctor that she was "off all psych meds." The therapist advised plaintiff against discontinuing her medications and tried to schedule her to see Dr. McManus, but plaintiff refused. The therapist wrote that "consumer will not take meds properly, therefore she is having an increase in these [depressive] symptoms." (R. 311). The note for a February 7, 2008, session indicates that plaintiff was still not compliant with medications. (R. 309)(therapist lined through the words "meds

13

compliant" and initialed the alteration).  The ALJ reasoned that Dr. Lopez' opinion was not consistent with the record, and that the record showed that "when the claimant is compliant with her treatment regimen, her condition has improved." (R. 16-17).  The court finds that the ALJ has stated "good cause," supported by substantial evidence of record, for rejecting Dr. Lopez' opinion[10] of May 1, 2008 and Dr. Ferrell's opinion of January 23, 2007.[11,12]

## Credibility Determination

Plaintiff argues that "the ALJ erred in discrediting Ms. Williams due to her ability to perform minimal daily activities." (Plaintiff's brief, p. 7; id., pp. 11-13).  Plaintiff's argument suggests that her "ability to perform minimal daily activities" was the sole reason articulated

---

[10] It appears that Dr. Lopez' opinion, as expressed in his letter to the food stamp office, was based on plaintiff's condition without regard to whether she was complying with her treatment regimen.  The ALJ, however, is permitted to consider evidence of noncompliance on the issue of whether plaintiff is disabled under the Social Security Act.  Plaintiff's treatment notes for the early part of 2007, when she was complying with her prescribed treatment, demonstrate that plaintiff is capable of complying and that her condition is substantially better when she does so.   Plaintiff also testified that she is able to follow her physicians' instructions regarding medication.  (See R. 33-34).

[11] As noted previously, the ALJ did not have Dr. Lopez' later opinion, as expressed in the August 7, 2008, letter to DDS, before him when he issued his decision.  The court has considered this later opinion from Dr. Lopez in assessing whether the ALJ's decision is supported by substantial evidence.  The letter is signed by plaintiff's primary therapist, Tammy McCarter, and Dr. Lopez.  Dr. Lopez and Ms. McCarter conclude that plaintiff is "not able to function adequately in a competitive job situation," an opinion which is – like Dr. Lopez' earlier opinion – on an issue reserved for the Commissioner.  Additionally, McCarter and Lopez write that "Ms. Williams participates fully with medication and therapeutic protocols" and is "consistent with attendance" at her group therapy meetings. (R. 148).  The record demonstrates that plaintiff was very often noncompliant with her treatment regimen, as noted by McCarter herself as late as May 2008 (see R. 314), a few months before McCarter and Lopez signed the August 1, 2008, letter attesting to plaintiff's compliance. (See Ex. 9F, 10F and 11F)(demonstrating irregular attendance in group therapy – there are no notes documenting attendance for scheduled sessions on certain dates and large gaps between some sessions – and demonstrating plaintiff's noncompliance with medications on multiple occasions). The August 1, 2008, letter does not deprive the Commissioner's decision of substantial evidentiary support.

[12] Plaintiff's argument that the ALJ erred by failing to find that her mental disorder meets Listing 12.04 rests on the opinions of Dr. Ferrell and Dr. Lopez. (Plaintiff's brief, pp. 13-14). Since the ALJ rejected these opinions properly, the court finds plaintiff's argument regarding the listing to be without merit.

14

by the ALJ for rejecting her credibility.[13]  The record demonstrates that plaintiff engaged in activities – including working regularly as a volunteer at her church's soup kitchen – which the court would not characterize as "minimal."  However, the court need not decide whether the evidence of plaintiff's daily activities supports the ALJ's credibility determination; even assuming that the ALJ erred by discrediting plaintiff's testimony because of her daily activities, any such error would not result in reversal on the present record.  Plaintiff's ability to engage in daily activities – minimal or not – was only one of several reasons articulated by the ALJ for discounting plaintiff's testimony of disabling pain and psychological symptoms.  The ALJ first articulated other valid reasons for discounting plaintiff's testimony, including: (1) her noncompliance with medications as noted in the SpectraCare records, and evidence that her psychological impairments "responded well to medication";[14] (2) as to her alleged physical limitations, that diagnostic tests – x-rays of her lumbar, cervical, and thoracic spine and nerve conduction studies – were all normal;[15] (3) the findings reported by Dr. Banner for plaintiff's

---

[13] She also argues, incorrectly, that "the ALJ erroneously discredited Dr. Ferrell's medical opinion *simply* because Ms. Williams engages in minimal daily activities." (Plaintiff's brief, p. 10)(emphasis added).

[14] Dr. Handel's records (Exhibit 2F) also demonstrate noncompliance with medications. See R. 187-88 (Dr. Pichler's note that plaintiff reported she was "doing well on her medication" but "[n]ever increased Zoloft, as per recommendation, for unclear reasons").

[15] See R. 161 (normal lumbar spine x-ray, 7/29/05); R. 260-63 (negative C-spine, T-spine, and L-spine xrays; normal coccyx and sacrum x-rays on 2/19/07); R. 264 (normal head CT on 2/19/07); R. 193 (plaintiff reported to Dr. Banner on 9/27/06 that nerve conduction studies were reported as normal). Plaintiff was prescribed a 12-session course of physical therapy in February 2007; the record includes a PT assessment on February 28, 2007 followed by a March 2, 2007 session (R. 229-35), an appointment for March 5 which was cancelled by plaintiff (R. 236), an appointment for March 9, 2007, for which plaintiff failed to appear (R. 237), and a record indicating that plaintiff was discharged from therapy on April 9, 2007 (R. 238). There are no records indicating that plaintiff continued with her prescribed course of physical therapy beyond her initial assessment and a single follow-up session.  (See Exhibit 8F).

consultative physical examination (Exhibit 4F) were inconsistent with plaintiff's complaints;[16] and (4) Dr. Flanagan's treatment notes suggest that plaintiff's musculoskeletal pain was "capable of stabilization" with medication (citing Exhibit 1F). (See ALJ decision at R. 20).[17] The reasons articulated by the ALJ for discounting plaintiff's testimony of pain and other subjective symptoms are both adequate and supported by substantial evidence of record, even without consideration of plaintiff's reported activities of daily living. The court, accordingly, rejects plaintiff's argument that the ALJ committed reversible error in assessing plaintiff's credibility.

## CONCLUSION

Upon review of the record as a whole, the court concludes that the decision of the Commissioner is supported by substantial evidence and proper application of the law. Accordingly, the decision is due to be AFFIRMED. A separate judgment will be entered.

DONE, this 7th day of February, 2011.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE

---

[16] See R. 194-95.

[17] Dr. Flanagan treated plaintiff for her complaints of pain between July and October 2005. (Exhibit 1F). His record includes a lumbar spine x-ray reported as "normal" (R. 161), plaintiff's report of a pain score of "0" after trigger point injections in her lumbar region for a period of two weeks (R. 156, 159), and Dr. Flanagan's note that plaintiff's results from MMPI and $P_3$ (patient pain profile) testing conducted on August 10, 2005 yielded a "Fake bad profile" and were invalid and "uninterpretable" (R. 156).